IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES EQUAL | : | |
| EMPLOYMENT OPPORTUNITY | : | |
| COMMISSION, et al. | : | |
|     Plaintiffs, | : | |
| | : | |
|         v. | : | CIVIL NO. L-04-3127 |
| | : | |
| WORTHINGTON, MOORE & | : | |
| JACOBS, INC. | : | |
|     Defendant. | : | |

**MEMORANDUM**

Now pending in this Title VII sexual harassment and retaliation suit is defendant

Worthington, Moore, & Jacobs, Inc.'s ("WMJ") motion for partial summary judgment.

For the reasons stated herein, the Court will, by separate Order filed this date, GRANT

the motion in part and DENY it in part.

## I.      BACKGROUND

On September 30, 2004, the Equal Employment Opportunity Commission

("EEOC") filed a Complaint on behalf of Jill Hennen, Elizabeth Ford, Melanie Sandy,

Lynne Geers, Diana Bantom, Laura Thomas, Nancy Guzman, and other unnamed female

employees of WMJ.  The Complaint alleges that WMJ violated Title VII of the Civil

Rights Act of 1964, 42 U.S.C. § 2000e et seq., by engaging in quid pro quo sexual

harassment, hostile work environment sexual harassment, and retaliation.  Thomas and

Guzman have retained their own attorneys and intervened in the action.  This means that

they are prosecuting their own action, independent of the EEOC.  See Fed. R. Civ. P. 24.

All seven women were formerly employed by WMJ, a commercial debt-

collection firm with offices in Ellicott City, Maryland and Dover, Delaware.  Ford,

Bantom, and Sandy were administrative assistants.  Hennen was a debt collector and then a client services representative, Thomas was a sales representative, Geers was Director of Client Services, and Guzman was the Manager of Administration.[1]  The dates of their employment were as follows:

|          |                            |
|----------|----------------------------|
| Hennen:  | December 1999-December 2000 |
| Ford:    | July 1998-March 2001       |
| Sandy:   | March 2000-March 2001      |
| Bantom:  | August 2000-January 2001   |
| Geers:   | July 1998-June 2002        |
| Thomas:  | April 2002-May 2003        |
| Guzman:  | July 2002-November 2003    |

During the relevant times, Sam Muffoletto was the president of the company and David Caprario was the CEO.

Generally speaking, the complaints of sexual harassment center on Sam Muffoletto.  The women offer a common litany of complaints: that Muffoletto touched them inappropriately, propositioned them, asked to share hotel rooms with them on business trips, and repeatedly made inappropriate sexual comments.  They allege that the company not only turned a deaf ear to their complaints but retaliated by taking a variety of adverse employment actions against them, including retaliatory harassment, termination, and constructive discharge.  In one case, the company's attorney threatened to sue the woman for defamation after she complained.

Because of the number of claimants, discovery stretched out until January 13, 2006.  Thereafter, WMJ filed this motion for partial summary judgment.  WMJ seeks summary judgment on the following:

---

[1]     Geers, Hennen, Bantom worked out of the Dover office. Sandy, Thomas, and Guzman worked in the Ellicott City office.  Ford worked in both offices.

(i)      all claims filed on behalf of Hennen, Ford, Sandy, Geers, and
         Bantom, on the grounds that they are barred by the doctrine of
         laches,

(ii)     the retaliation claims of Thomas,

(iii)    the retaliation claims of Guzman,

(iv)     the retaliation claims of Hennen, Ford, Sandy, Geers, and Bantom,
         and

(v)      the quid pro quo sexual harassment claims of Hennen, Ford,
         Sandy, Bantom, Thomas and Guzman.

The Court will, by separate Order,

(i)      DENY the motion for summary judgment based on the laches
         defense, without prejudice to refiling.  If WMJ elects to refile,
         further discovery and briefing may be required,

(ii)     GRANT the motion for summary judgment with respect to
         Thomas's claims of a retaliatory pay cut and retaliatory
         constructive discharge, but DENY the motion with respect to
         Thomas's other retaliation claims,

(iii)    DENY the motion for summary judgment on Guzman's retaliation
         claims,

(iv)     DENY the motion for summary judgment on the retaliation claims
         of Hennen, Ford, Sandy, Geers, and Bantom because WMJ, by
         providing only perfunctory briefing, effectively abandoned this
         motion, and

(v)      DENY the motion for summary judgment on the quid pro quo
         sexual harassment claims of Hennen, Ford, Sandy, Bantom,
         Thomas, and Guzman because WMJ, by failing to brief this motion
         at all, effectively abandoned it.[2]

---

[2]      It is not clear whether WMJ intended to move for summary judgment on the quid pro quo sexual
harassment claims.  In the introductory paragraphs of its partial motion for summary judgment, WMJ
claimed to be moving for summary judgment on these claims.  Nowhere in the brief, however, did WMJ
provide arguments to support the motion.  Accordingly, the Court will DENY the motion without further
discussion.

The Court will hold a hearing to (i) discuss whether WMJ wishes to pursue the laches issue, and, if so, to set a discovery and briefing schedule, and (ii) schedule a trial on the surviving claims.

## II.     STANDARD FOR SUMMARY JUDGMENT

The Court may grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); see also Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987) (recognizing that trial judges have "an affirmative obligation" to prevent factually unsupported claims and defenses from proceeding to trial).  Nevertheless, in determining whether there is a genuine issue of material fact, the Court views the facts, and all reasonable inferences to be drawn from them, in the light most favorable to the non-moving party.  Pulliam Inv. Co. v. Cameo Properties, 810 F.2d 1282, 1286 (4th Cir. 1987).

## III.     ANALYSIS

### A.     Doctrine of Laches

#### 1.     Background

The time lag between the employment of Hennen, Ford, Sandy, Bantom, and Geers and the institution of this lawsuit has generated a laches defense.  Hennen, Ford, and Sandy all filed charges with the EEOC in early 2001.  On March 27, 2002, the EEOC

made "no cause" determinations[3] and issued "right to sue notices" informing them that they had 90 days to file a civil action.  They did not file.

On May 20, 2003 and January 14, 2004, respectively, Thomas and Guzman filed charges with the EEOC.  Noting the similarities to Hennen, Ford, and Sandy's claims, the EEOC reopened those charges on April 13, 2004.  In the course of its investigation, the EEOC discovered that Bantom and Geers also claimed to have experienced sexual harassment and retaliation at WMJ.  Bantom and Geers had never filed charges with the EEOC.  The EEOC brought this lawsuit on behalf of all seven women on September 30, 2004.

## 2.  Analytical Framework

WMJ argues that the EEOC's claims on behalf of Hennen, Ford, Sandy, Bantom, and Geers are barred by the doctrine of laches.  In order to address this argument, it is important to understand how statutes of limitations work in Title VII cases.

Private litigants must follow a strict timetable in order to bring suit under Title VII.  First, they must file a charge with the EEOC within either 180 or 300 days of experiencing a Title VII violation.  42 U.S.C. § 2000e-5(e).  The EEOC investigates the charge and issues either a "reasonable cause" or "no cause" determination and a right-to-sue notice.  The employee then has 90 days to file suit in court.  42 U.S.C. § 2000e-5(f)(1).  If he does not file within 90 days, his suit is time barred.

As mentioned, Hennen, Ford, and Sandy all filed timely charges with the EEOC.  The EEOC issued each woman a "no cause" determination and a right-to-sue notice.  None of the women filed a civil lawsuit, thereby forfeiting their right to bring suit on

---

[3]     The EEOC issues a finding of no cause when it "completes its investigation and finds that there is not reasonable cause to believe that an unlawful employment practice has occurred."  29 C.F.R. § 1601.19(a).

their own behalf.  Bantom and Geers never filed EEOC charges, and their time for doing so expired in 2001 and 2003, respectively.  Accordingly, they too are barred from bringing a civil suit on their own behalf.

The parties acknowledge that a different set of rules applies to cases brought by the EEOC.  They disagree, however, as to the formulation of the rules and how they apply to this case.  The parties' briefing on these issues is difficult to follow and centers primarily on whether or not the EEOC can use the continuing violation theory to sweep in the claims of the five women.  Cutting the Gordian Knot, the Court concludes that the applicable framework is as follows.

The EEOC can bring suit on behalf of anyone who has filed a timely charge of discrimination (a "charging party").  It can also use the charge as a "jurisdictional springboard"[4] to bring suit for other violations.  See General Telephone Co. v. EEOC, 446 U.S. 329, 332 (1980).  "Any violations that the EEOC ascertains in the course of a reasonable investigation of the charging party's complaint are actionable."  Id.

There is no statute of limitations on actions filed by the EEOC.  See Occidental Life Insurance Co. v. EEOC, 432 U.S. 355 (1977) (holding that neither § 2000e-5(f) nor state limitations periods apply to actions by the EEOC).  If, however, a defendant is prejudiced by the EEOC's unexcused delay in bringing suit, a court may fashion relief under the doctrine of laches.  See id.[5]  To establish the equitable defense of laches, the defendant must prove "(1) lack of diligence by the party against whom the defense is

---

[4]     EEOC v. General Elec. Co., 532 F.2d 359, 364 (4th Cir. 1976) (quoting EEOC v. Huttig Sash & Door Co., 511 F.2d 453, 455 (5th Cir. 1975)).

[5]     Defendants may assert this defense against the EEOC.  See EEOC v. Navy Federal Credit Union, 424 F.3d 397, 409 (4th Cir. 2005); EEOC v. Peterson, Howell & Heather, Inc., 702 F.Supp. 1213 (D. Md. 1989).

asserted, and (2) prejudice to the party asserting the defense." White v. Daniel, 909 F.2d 99, 102 (4th Cir. 1990) (internal quotation marks omitted).

### 3.   Hennen, Ford, and Sandy Claims

The Court must address two primary issues to determine whether the Hennen, Ford, and Sandy claims are properly before this Court.  First, whether the EEOC has the authority to bring the claims, either because the three women are "charging parties," or, alternatively, because their claims were "ascertained" during a "reasonable" investigation of the Thomas and Guzman charges.  Second, assuming the EEOC does have the authority to bring the claims, whether they barred by the doctrine of laches.

The EEOC first claims that the Hennen, Ford, and Sandy allegations are properly part of this action because each woman is a "charging party."  WMJ does not dispute that Hennen, Ford, and Sandy filed timely charges with the EEOC.  Instead, it argues that the three women are not "charging parties" for the purposes of this lawsuit because the EEOC closed their charges and did not have the authority to reopen them more than two years later.

The EEOC reopened the charges pursuant to 29 C.F.R. § 1601.19(b), which permits it to reconsider a "no cause" finding and issue a "notice of intent to reconsider." Section 1601.19(b) does not place a time limit on an EEOC decision to reconsider a no cause determination.  Courts, however, have routinely held that agencies must reconsider decisions within a "reasonable time period."  See, e.g., Dun & Bradstreet Corp. Foundation v. U.S. Postal Service, 946 F.2d 189, 193-94 (2d Cir. 1991).  This rule balances the "desirability of finality against the general public interest in attaining the

correct result in administrative cases."  Id. (citing Civil Aeronautics Bd. v. Delta Air Lines, Inc., 367 U.S. 316 (1961)).

In the instant case, the EEOC waited more than two years to reopen the three charges.  By that time, WMJ had a reasonable expectation that the matter was closed.  Accordingly, the Court finds that the EEOC exceeded its authority when it reopened the charges.

This finding is not fatal to the three claims, however, if they were "ascertained" in the course of the Thomas/Guzman investigation.  Neither side has stated the legal test for determining when a claim was ascertained in the course of a reasonable EEOC investigation.  The Court's non-exhaustive research has not uncovered a test.   The Court cannot decide this issue without further briefing on (i) the appropriate test, and (ii) the application of the test to the facts of this case.

Assuming that the three claims were "reasonably ascertained" in the course of the Thomas/Guzman investigation, this Court must then decide whether WMJ has mounted an adequate laches defense.  The first element of the defense cuts in favor of WMJ.  This element "is satisfied where a plaintiff has unreasonably delayed in pursuing his claim."  White, 909 F.2d at 102.  The EEOC knew about Hennen, Ford, and Sandy's claims in 2001.  It took a year to investigate and then issued a "no cause" determination.  More than two years later, it conducted a new investigation that reached a different outcome.  What the EEOC has not done is describe its first investigation and explain why it failed to

uncover the alleged violations during it.[6]  Accordingly, the first factor weighs in favor of WMJ.

WMJ has also made a preliminary showing as to the second factor, prejudice. Much of the alleged sexual harassment occurred when Sam Muffoletto was alone with the claimants.  Mr. Muffoletto died shortly after this suit was filed.  He is, therefore, unavailable to take the stand and tell his side of the story.

What remains unaddressed is whether the prejudice can be mitigated.  The EEOC apparently investigated the Hennen, Ford, and Sandy claims, as did WMJ.  Neither side has discussed whether they adequately investigated the facts, whether the facts are memorialized in a record, or whether portions of the record might be admissible at trial. If portions of the record are admissible, they could substitute for Muffoletto's testimony, thereby mitigating any prejudice to WMJ.

Finally, the parties have not addressed whether any prejudice to WMJ could be mitigated by dismissing certain claims or restricting damages available to the plaintiff, as opposed to dismissing the case altogether.  See EEOC v. Peterson, Howell & Heather, Inc., 702 F.Supp. 1213, 1220 (D. Md. 1989).

WMJ has not made a sufficient showing to establish the affirmative defense of laches.  Accordingly, the motion for summary judgment on this basis is DENIED.  This denial is without prejudice.  As stated, the Court will afford WMJ the opportunity to complete the record if it so chooses.

### 4.  Bantom and Geers Claims

---

[6]    The EEOC appears to argue that the Thomas and Guzman claims bolster the claims of the first three women.  It is difficult to see why the EEOC needed Thomas and Guzman's claims in order to make a case on behalf of Hennen, Ford, and Sandy.

Many of the same problems attach to WMJ's claim that Bantom and Geers's claims are barred. Once again, the parties have not laid out a test for determining whether these claims were "ascertained" in the course of a "reasonable" investigation into the Thomas and Guzman claims. Neither party has adequately addressed three prongs of the laches analysis. Accordingly, the Court will DENY WMJ's motion for summary judgment on Bantom and Geers's claims without prejudice. As stated, the Court will afford WMJ the opportunity to complete the record if it so chooses.

### B.    Retaliation Claims

At the summary judgment stage, a retaliation claim must be analyzed under the familiar McDonnell Douglas burden-shifting framework. McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). The plaintiff must first establish, by a preponderance of the evidence, a prima facie case of retaliation. Beall v. Abbott Lab., 130 F.3d 614, 619 (4th Cir. 1997). To do this, the plaintiff must show that: (i) she engaged in a protected activity, (ii) she suffered an adverse employment action, and (iii) there is a causal connection between the protected activity and the adverse action. Id. In the context of a retaliation claim, an adverse employment action is an action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington Northern and Santa Fe Ry. Co. v. White, 126 S.Ct. 2405, 2415 (2006) (quoting Rochon v. Gonzalez, 438 F.3d 1211, 1219 (D.C. Cir. 2006)) (internal quotations omitted).[7] Normally, "petty slights, minor annoyances, and simple lack of good manners will not create such deterrence." Id.

---

[7]    Prior to the Supreme Court's decision in Burlington, retaliatory harassment constituted an adverse employment action if there was "evidence of conduct 'severe or pervasive enough' to create 'an environment that a reasonable person would find hostile or abusive.'" Von Gunten v. Maryland, 243 F.3d 858, 869-70 (4th Cir. 2001) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). In Burlington,

Once the plaintiff has established a prima facie case, the defendant must articulate a legitimate, nonretaliatory reason for the adverse employment action.  Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 142 (2000).  If the defendant offers such a reason, the plaintiff is "afforded the opportunity to prove by a preponderance of evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext" for retaliation. Id.

### 1.     Laura Thomas

#### a.     Background

Viewed in a light most favorable to Thomas, the history of her employment with WMJ is as follows.  She began work there on April 17, 2002.  As a sales representative, she was responsible for contacting and cultivating relationships with potential customers ("leads").  Her guaranteed monthly salary was $3,000, and she was eligible to earn commissions of 20 percent to the extent that the fees she generated exceeded $15,000. Sam Muffoletto, the company president, was her supervisor.

The parties agree that Thomas's performance was satisfactory during the first two months of her employment.  Her productivity then began to decline.  In July 2002, Thomas began working from home.  On September 3, 2002, 250 of Thomas's leads were removed from her queue.  In a letter dated December 31, 2002, Sam Muffoletto, who allegedly had been sexually harassing Thomas for months, wrote a her a memorandum

---

however, the Supreme Court articulated a broader standard for an adverse employment action in retaliation cases.  See Moore v. City of Philadelphia, 461 F.3d 331 (3rd Cir. 2006) (recognizing that Burlington abrogates the Third Circuit's earlier test for retaliatory harassment, which was similar to the Fourth Circuit's Von Gunten test).

explaining that her pay would be reduced if her performance did not improve in January and February of 2003.[8]

On February 27, 2003, Thomas, through her attorney, Francine Weiss, wrote a letter to Caprario outlining the harassment she had allegedly suffered at the hands of Sam Muffoletto and demanding a settlement.[9]  In a letter to Weiss dated March 7, 2003, Mark Muffoletto, WMJ's general counsel,[10] denied Thomas's allegations and threatened legal action against Thomas and/or her attorney for defamation.  The letter also stated, "Given the fact that your letter has arrived almost simultaneously with the change in salary, it makes sense that Ms. Thomas is seeking a quick payday . . ."[11]  Around this time, Caprario took over as Thomas's supervisor.[12]

On March 13, 2003, Mark Muffoletto addressed another letter to Weiss.  He wrote, "It has not escaped us that [Thomas] is desperately trying to extort money for no other reason than to cover for her own non-performance and inabilities."  He again threatened to bring actions against Thomas, this time for slander and tortious interference with economic interests.[13]

On March 31, 2003, Caprario informed Thomas in writing that he was reducing her monthly guarantee to $1,500 and her fee goal to $6,000, effective April 1, 2003.[14]  On May 1, 2003 Caprario congratulated Thomas in an e-mail for surpassing her fee goal for

---

[8]     Thomas's Resp., Ex. J (Docket No. 87).
[9]     Thomas's Resp., Ex. K (Docket No. 87).
[10]    Mark Muffoletto is the son of Sam Muffoletto.
[11]    Thomas's Resp., Ex. M (Docket No. 87).
[12]    Thomas's Resp. at 12 (Docket No. 87).
[13]    Thomas's Resp., Ex. S (Docket No. 87).
[14]    Thomas's Resp., Ex. N (Docket No. 87).

April.  Ten days later, however, he noted in an e-mail that her call volume was again declining.[15]

On May 15, 2003, Caprario announced to Thomas and others that a training seminar would be held on May 23, 2003.[16]  The next day, Thomas informed him that her daughter had a doctor's appointment that day, but she would try to reschedule.  During the next several hours, Thomas and Caprario engaged in an e-mail debate about the company's leave policies. Finally, Thomas told Caprario she was resigning, effective July 11th.  Caprario wrote back a few hours later, telling her that her resignation was effective immediately.

Thomas claims that WMJ retaliated against her for complaining about sexual harassment by:  (i) cutting her monthly guarantee in half, (ii) subjecting her to retaliatory harassment, and (iii) constructively discharging and/or firing her.  The Court will analyze the McDonnell Douglas test with respect to all three allegations.

### b.      Salary Cut

### i.      Prima Facie Case

Thomas has established a prima facie case for a retaliatory reduction in pay.  She engaged in a protected activity when she complained about sexual harassment on February 27, 2003.  See 42 U.S.C. § 2000e-3(a).  A pay cut is an adverse employment action.[17]  Finally, Mark Muffoletto informed Thomas that her pay was being cut only ten days after her February 27th complaint.  Closeness in time between a protected activity

---

[15]      WMJ's Mot. for Partial Summ. J., Ex. 14 (Docket No. 78).
[16]      WMJ's Mot. for Partial Summ. J., Ex. 17 (Docket No. 78).
[17]      See Boone v. Goldin, 178 F.3d 253, 255 (4th Cir. 1999).  WMJ claims that these changes did not constitute a reduction in pay because Thomas could still earn the same amount of money if she maintained her sales.  Title VII's anti-retaliation provision covers "employer actions that would have been materially adverse to a reasonable employee."  Burlington Northern and Santa Fe Ry. Co. v. White, 126 S.Ct. 2405, 2409 (2006).  A reasonable employee could find a one-half reduction in guaranteed pay adverse.

and an adverse employment action is "sufficient to make a *prima facie* case of causality."

Tinsley v. First Union Nat. Bank, 155 F.3d 435, 443 (4th Cir. 1998) (internal citation

omitted) (abrogated on other grounds).  Accordingly, the burden shifts to WMJ to put

forth a legitimate, non-retaliatory reason for cutting Thomas's monthly guarantee.

### ii.        Legitimate, Nonretaliatory Reason

In its summary judgment motion, WMJ claims that it had long planned to cut

Thomas's monthly guarantee if her performance did not improve.  It notes that her

performance had steadily declined after the first two months of her employment.  In

December 2002, for example, she brought in only $3,972 in new business fees, which

was only 26.48 percent of her goal of $15,000.[18]  On December 31, 2002, Sam

Muffoletto wrote Thomas a letter, explaining that her guarantee of $3,000 per month

would be cut if she did not meet her fee goals in January and February.[19]

Thomas did not come close to meeting her fee goals in January and February.[20]

In fact, her performance deteriorated further.[21]  As a result, WMJ, as promised, reduced

Thomas's monthly guarantee.  Mark Muffoletto's March 7th letter to Thomas's attorney

referred to the reduction, and on March 31st, Caprario wrote Thomas a letter explaining

her new compensation structure.[22]

In sum, the evidence shows that company officials warned Thomas well before

she complained of sexual harassment that her performance needed to improve in order to

avoid a reduction in her monthly guarantee.  WMJ has, therefore, put forth a legitimate,

---

[18]      WMJ's Mot. for Partial Summ. J., Ex. 2 (Docket No. 78).
[19]      WMJ's Mot. for Partial Summ. J., Ex. 4 (Docket No. 78).
[20]      She met only 19.59 percent of her fee goal in January and 21.07 percent of her fee goal in February.  WMJ's Mot. for Partial Summ. J., Ex. 2 (Docket No. 78).
[21]      WMJ's Mot. for Partial Summ. J., Ex. 2 (Docket No. 78).
[22]      WMJ's Mot. for Partial Summ. J., Ex. 7 (Docket No. 78).

non-retaliatory reason for the reduction.  Accordingly, the burden shifts to Thomas to show that WMJ's explanation is pretextual.

### iii.    Pretext

Drawing all inferences in favor of Thomas, the Court must assess the record to determine if it fairly suggests that the proffered reasons for the pay cut are false.  Reeves, 530 U.S. at 147-49.  The Court finds that Thomas has failed to establish any genuine dispute of material fact that could lead a jury to conclude that WMJ's stated reasons were pretextual.

Thomas first claims that WMJ's statistics about her performance are inaccurate. She has provided no evidence to support this contention, however.  Moreover, she has not attempted to prove that she was performing up to expectations.[23]

Second, Thomas claims that WMJ did not reduce the guarantees of other employees who were underperforming.  She is correct that other sales representatives performed poorly.  WMJ's sales statistics show that Anthony Nobilio and Al Townsend were performing well below expectations.[24]  Thomas is wrong, however, when she claims that they were not disciplined.  Caprario testified at his deposition that WMJ cut Nobilio's guarantee sometime in 2003. WMJ planned to cut Townsend's guarantee as well, but fired him for poor attendance instead.[25]  Thomas has offered no competing evidence to create a genuine dispute of material fact on this issue.

The record shows that Thomas consistently underperformed for months before she complained of sexual harassment.  The company has demonstrated that it intended to cut her guarantee to a level more consistent with her production if her performance did

---

[23]    Thomas claims that if she was underperforming, it was because she was being sexually harassed.
[24]    EEOC's Reply to Thomas & Guzman's Resps. Ex. 50 (Docket No. 94).
[25]    EEOC's Reply to Thomas & Guzman's Resps. Ex. 51, 52 (Docket No. 94).

not improve.  The plan pre-dated her complaints of discrimination.  A jury verdict in favor of Thomas on her retaliatory pay cut claim would be based on speculation rather than evidence.[26]  Accordingly, the Court will GRANT WMJ's motion for summary judgment on this claim.

**c.      Retaliatory Harassment**

Thomas's second claim is that Caprario and others engaged in a campaign of harassment against her in the weeks and months after her February 27th complaint.  The alleged harassment consisted of threats of legal action and termination, demeaning language, micromanagement by Caprario, and changes in workplace policies.

As mentioned, Mark Muffoletto responded to Thomas's complaints of sexual harassment by threatening to sue Thomas and/or Weiss for slandering Sam Muffoletto and the company.[27]  A reasonable jury could conclude that this threat was retaliatory and severe enough to "dissuade[] a reasonable worker from making or supporting a charge of discrimination."  <u>Burlington Northern</u>, 126 S.Ct. at 2409.  Accordingly, Thomas's retaliatory harassment claim will go forward to a jury.  Evidence of the other allegedly retaliatory actions will be admissible at trial.[28]

---

[26]      Thomas points to a number of undisputed facts to support her claim that the pay cut was retaliatory:  (i) Sam Muffoletto, her alleged harasser, participated in the decision to cut her pay (Docket No. 87, Ex. B at 315), (ii) Mark Muffoletto mentioned the pay cut in his official response to her claims of harassment, (iii) Caprario admitted that he "could have" referred to Thomas as a "bitch" after her complaint Thomas's Resp., Ex. B at 335 (Docket No. 87).  These factors do not undercut the principle factors in the case, namely Thomas's deteriorating performance, the company's pre-conceived plan to cut her pay if there was no improvement, and Thomas's continued poor performance.

[27]      Specifically, Mark Muffoletto threatened to sue Thomas and/or Weiss for slander because the letter, which outlined Thomas's charges against Sam Muffoletto, was not marked "personal and confidential" and was, therefore, seen by the administrative personnel who opened it.  Thomas's Resp., Ex. M (Docket No. 87).

[28]      The Court notes, however, that Thomas's claim that Caprario's foul language contributed to the retaliatory harassment is weak.  Although Mark Muffoletto testified that he heard Caprario refer to Thomas as a "bitch," "fucking bitch," and "cunt," Thomas has not pointed to any evidence that she heard Caprario use these terms or that Caprario only began using them after she complained of sexual harassment.  <u>See</u> Thomas's Resp., Ex. L at 177-78 (Docket No. 87).

### d.       Retaliatory Discharge

Finally, Thomas claims she was constructively discharged and then terminated in retaliation for her complaints about sexual harassment.  On May 16, 2003, Caprario declined to grant Thomas's request for time off on May 23, 2003 to take her daughter to the doctor.  Later that day, Thomas wrote an e-mail telling Caprario that her last day of work would be July 11, 2003, which was seven weeks in the future.  She complained that she had suffered retaliation since accusing Sam Muffoletto of sexual harassment.  She stated, "I will pursue every remedy to ensure that others will NOT be victimized."  Four hours later, Caprario wrote back, stating "Your last work day is today."[29]

### i.       Retaliatory Constructive Discharge

Constructive discharge occurs when an employer "deliberately makes an employee's working conditions intolerable and thereby forces [her resignation]." Holsey v. Armour & Co., 743 F.2d 199, 209 (4th Cir.1997) (internal citations omitted). The test for "intolerability" is an objective inquiry into whether a similarly situated reasonable person would have felt "compelled" to resign.  Carter v. Ball, 33 F.3d 450, 459 (4th Cir. 1994).

Thomas has failed to show that her working conditions were "intolerable" at the time she resigned.  Sam Muffoletto's alleged sexual harassment had stopped months before,[30] and he was no longer her supervisor.  She worked at home, and therefore had little personal contact with other employees.  Although Thomas had a number of run-ins with her new boss, Caprario, about company policies and her performance, "dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult

---

[29]       Thomas's Resp., Ex. T (Docket No. 87).
[30]       Thomas's journal detailing her harassment ends on January 31, 2003.  Thomas's Resp., Ex. H (Docket No. 87).

or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign." Id. at 459.  Moreover, Thomas planned to stay at her job for seven weeks after she gave her resignation.

Thomas may have been unhappy in her job, but she has not shown that her working conditions were intolerable.  Accordingly, her claim of constructive discharge fails as a matter of law.

### ii.     Retaliatory Termination

Thomas also argues that Caprario's announcement that her resignation would be effective immediately, not seven weeks in the future, constituted a retaliatory termination. This termination occurred fewer than three months after Thomas complained of sexual harassment and only four hours after she complained of retaliation and told Caprario she intended to seek redress.

WMJ claims that Caprario dismissed Thomas because he was concerned about her having access to client databases while looking for a job with a competitor.[31]  WMJ has not, however, shown that it was standard practice to require employees to make their resignations effective immediately.  Moreover, Caprario's e-mail did not cite this rationale for requiring Thomas to leave immediately.  Instead, it discussed Thomas's poor performance, her "insubordination with respect to work standards" and "excessive time missed during regular work hours."[32]  Caprario also noted Thomas's "unfounded allegations made to [] colleagues," and stated, "We take exception to your false

---

[31]     EEOC's Reply to Thomas & Guzman's Resps. at 17 (Docket No. 94).

[32]     Thomas's Resp., Ex. T (Docket No. 87).  In its briefs, WMJ also claims that Caprario learned from another employee that Thomas told him she was thinking about leaving at 11 a.m. on May 23rd for the beach.  Caprario's e-mail does not mention this incident, and WMJ has not pointed to any evidence supporting this claim.

accusations and are prepared to defend your attempts to impugn our character to whatever extent is necessary."[33]

Given the shifting rationales provided for Thomas's termination and the references to her complaints, a reasonable jury could conclude that Thomas's complaints about sexual harassment and retaliation were the impetus for her immediate termination. Accordingly, the Court finds that the reason for the termination is for the jury to decide.

## 2.   Nancy Guzman

Viewing the facts in a light most favorable to Guzman, the history of Guzman's employment is as follows.  She was hired as Manager of Administration in July 2002. Her duties included preparing job descriptions, managing legal forwarding, and maintaining the company phone list.[34]  Her initial salary of $35,000 was increased to $40,000 after several months.

In April or May of 2003, Guzman complained to Mike O'Connor, the Director of Operations, that Sam Muffoletto was sexually harassing her.  Soon afterward, she was removed from her private office and she was no longer able to log on to the Fed Ex computer.  She was shunned and given tedious work that she, as a manager, had never been required to perform before.[35]

In May of 2003, Guzman received an excellent performance evaluation from Sam Muffoletto.[36]  The next month, however, her responsibilities for supervising employees in the company's Delaware office were removed.[37]

---

[33]     Thomas's Resp., Ex. T (Docket No. 87).
[34]     EEOC's Mot. for Summ. J., Ex. 23, 24 (Docket No. 78).
[35]     Guzman's Resp., Ex. 5 at 6-7 (Docket No. 85).
[36]     Guzman's Resp., Ex. 3 at 35 (Docket No. 85).
[37]     EEOC's Reply to Thomas & Guzman's Resps., Ex. 49 (Docket No. 94).

In September 2003, Guzman was ordered to meet with the company's attorney, Jeanne Phelan, who was representing WMJ in a sexual harassment matter.[38]  Guzman initially told Phelan that she was afraid to speak for fear of being fired, but then admitted that the "allegations of sexual harassment were true."[39]  About a week later, Guzman was asked to meet with an EEOC investigator with Phelan present.  Again, Guzman told the investigator she was afraid to speak for fear of being fired.

After these conversations, Guzman was routinely excluded from important meetings.  O'Connor began to accuse her of failing to meet deadlines.  Guzman's new office mate, Ron Marttila, began documenting her personal calls.  Minnie Bailey, the final employee under Guzman's supervision, was transferred to the supervision of someone else.[40]  Finally, on November 10, 2003, Caprario called Guzman into his office and fired her.[41]

### a.      Retaliation During Employment

Guzman claims that WMJ retaliated against her by removing her supervisory functions, placing allegedly false e-mails in her personnel file, directing her not to communicate with clients, monitoring her phone calls, removing equipment she needed to do her work, requiring her to take on "tedious" tasks even though she was a manager, and excluding her from meetings.[42]

---

[38]      Phelan is representing WMJ in this case.  She may be called upon to testify concerning the interview.  Neither side has addressed how this would be done and whether her status as a witness might require her to withdraw as counsel.

[39]      Guzman's Resp., Ex. 5 at 11 (Docket No. 85).

[40]      Guzman's Resp., Ex. 5 at 7 (Docket No. 85).

[41]      Id. at 8.  WMJ claims that Guzman resigned.  At this stage of the litigation, however, the Court must assume the facts in the light most favorable to Guzman.

[42]      Guzman argues that each of these actions was a discrete adverse employment action.  The Court need not address each allegation individually, because the Court finds that even if a jury does not consider each action an adverse employment action, it could conclude that all of these actions, taken together, constituted retaliatory harassment.

WMJ apparently does not dispute that Guzman's three conversations with company officers and attorneys about sexual harassment constituted protected activities or that the actions Guzman alleges were retaliatory actually occurred in the aftermath of those conversations.  Instead, WMJ contends first, that these actions were not adverse employment actions, and second, even if they were, WMJ had legitimate, non-retaliatory reasons for removing some of Guzman's job duties.

The Court finds that a reasonable employee could be dissuaded from complaining of sexual harassment if she knew that her job responsibilities would be changed, her supervisory functions removed, and her actions monitored if she spoke up.[43] Accordingly, a jury could conclude that Guzman established a prima facie case of retaliatory harassment.

WMJ claims that it had legitimate, nonretaliatory reasons for its actions.  It has not, however, attempted to offer any explanation for monitoring Guzman's phone calls, removing the Federal Express computer, or requiring Guzman to perform tedious tasks.

 WMJ also offers explanations for removing two of Guzman's job duties.  First, WMJ claims that Guzman's supervisory duties in the Delaware office were removed because someone else was hired to perform them.  WMJ makes no effort to explain why the hiring of someone else to take over Guzman's duties was not a retaliatory act.[44] Second, WMJ claims that Guzman's legal duties diminished because there was less legal

---

[43]      In its brief, WMJ says it is attacking the causal connection between the protected activities and the alleged retaliatory conduct.  Because WMJ is offering alternate explanations for taking action against Guzman, the Court will analyze this argument under the second prong of the three-prong McDonnell Douglas standard.

[44]      EEOC's Reply to Thomas & Guzman's Resps. at 4 (Docket No. 94).

work to be done.[45]  This does not, however, address the complete removal of Guzman's legal duties later in her employment.[46]

A jury could reasonably find that WMJ has failed to offer a legitimate, non-retaliatory reason for the actions Guzman cites.  Accordingly, Guzman's retaliatory harassment claim survives summary judgment.

### b.      Retaliatory Discharge

Guzman next claims that after her two conversations with Phelan and the EEOC investigator, WMJ executives began trying to manufacture reasons to fire her.  WMJ apparently concedes that Guzman has established a prima facie case of retaliatory discharge.  It claims that it is nonetheless entitled to summary judgment because it had three legitimate, non-retaliatory reasons for firing her. [47]

First, on October 20, 2003, Guzman tipped off another employee to Sam Muffoletto's "surprise" visit to the Delaware office.[48]  She does not deny that she knew the visit was intended as a surprise.[49]  Instead, she argues that this explanation is a pretext because what she did was not a fireable offense.  Notably, one employee in the Delaware office stated in an affidavit that it was "not unusual" for WMJ managers, including O'Connor and Caprario, to warn her in advance of the "surprise" visits.[50]

Second, Guzman revealed allegedly confidential information she learned at a meeting in October 2003.  At the meeting, management announced that Minnie Bailey

---

[45]      EEOC's Reply to Thomas & Guzman's Resps. at 4 (Docket No. 94).

[46]      EEOC's Reply to Thomas & Guzman's Resps. Ex. 49 at 55-57  (Docket No. 94).

[47]      WMJ also claims it is entitled to summary judgment because Guzman resigned.  At this stage of the litigation, the Court must assume she was fired.

[48]      Muffoletto apparently dropped in unannounced at the Delaware office to make sure everything was running smoothly.

[49]      In her e-mail, she wrote, "Well, you didn't hear it from me."  EEOC's Mot. for Summ. J., Ex. 27 (Docket No. 78).

[50]      Guzman's Resp., Ex. 10 (Docket No. 85).

would no longer be reporting to Guzman.  Attendees were told that they were not to discuss the meeting with other people, except that new supervisors could tell their supervisees about the new reporting relationship.  Guzman admits she told Bailey that she was no longer her supervisor,[51] but again, she claims that her actions did not constitute a fireable offence.

Finally, WMJ alleges that Guzman made inappropriate comments to another employee, Jennifer Seaman, on November 6, 2003.  Seaman wrote a summary of the comments and gave it to management.  In her statement, Seaman accused Guzman of the following: calling coworkers "backstabbers," telling her that another employee said Seaman's clothes were too tight, saying that O'Connor "whored out" his own sister, calling Caprario "cheap," calling another employee an "asshole," and commenting on the performance of other employees.[52]  Guzman acknowledges that she made some of these statements,[53] but she testified that a culture of gossip pervaded WMJ.[54]  Moreover, she was never disciplined for talking about coworkers until after she met with Phelan and the EEOC.

Even viewing all three reasons together, the Court finds that there is a legitimate factual dispute as to whether the proffered reasons are pretextual.  Guzman received an excellent evaluation the spring before she was terminated, and her performance continued to be satisfactory.[55]  She had no infractions in her work file prior to her meetings with

---

[51]    Guzman's Resp., Ex. 5 at 8 (Docket No. 85).

[52]    EEOC's Mot. for Summ. J., Ex. 28 (Docket No. 78).  Seaman neither gave a deposition or provided a signed affidavit in this case.  It is undisputed, however, that WMJ managers knew about Seaman's allegations when they fired Guzman.

[53]    Guzman's Resp., Ex. 1 at 233-37 (Docket No. 85).

[54]    Guzman's Resp., Ex. 1 at 169-70 (Docket No. 85).

[55]    WMJ acknowledges that there are factual disputes about whether Guzman's performance was satisfactory in the time leading up to her termination.  EEOC's Reply to Thomas & Guzman's Resps. at 5

Phelan and the EEOC.[56]  These factors and the arguably minor nature of her infractions could lead a reasonable jury to conclude that WMJ's explanations are pretextual.[57]

### c.   Retaliatory Interference with Employment Opportunities

Guzman's final claim is that the retaliation continued after she was fired.  In particular, she claims that she had several good job prospects that evaporated once the potential employers contacted WMJ.  As Guzman noted in her response, WMJ made no mention of this claim in its motion for summary judgment.[58]  Only in its reply did WMJ explain that it thought Guzman had dropped this claim.[59]  The moving party may not raise new grounds for summary judgment in a reply brief.  Accordingly, the Court will DENY summary judgment on this claim.

### 3.   Hennen, Ford, Sandy, Bantom and Geers

WMJ has also moved for summary judgment on the retaliation claims brought on behalf of Hennen, Ford, Sandy, Bantom and Geers.  In its briefing, however, WMJ made only a perfunctory attempt to support the motion.  Accordingly, the motion will be DENIED.

---

n.2 (Docket No. 94).  At this stage of the litigation, the Court must view the facts in a light favorable to Guzman.

[56]      Guzman's Resp., Ex. 3 at 381 (Docket No. 85).

[57]      Guzman also claims that at least one other employee who committed much more serious infractions was not fired.  She cites to the depositions of Robert Muffoletto, Mark Muffoletto, and O'Connor to support this claim.  Although Robert Muffoletto acknowledged that this employee had sex in the office, he stated that he did not know what, if any, disciplinary action was taken against the offender.  The Court cannot determine what Mark Muffoletto and O'Connor said about this employee because Guzman failed to include the relevant pages of their depositions as exhibits.  See Guzman's Resp. at 39 n.24 (Docket No. 85).

[58]      Guzman's Resp. at 39-40 (Docket No. 85).

[59]      EEOC's Reply to Thomas & Guzman's Resps. at 9-10 (Docket No. 94).

**IV.**     **<u>CONCLUSION</u>**

For the reasons stated herein, the Court will, by separate Order filed this date,

GRANT in part and DENY in party WMJ's motion for partial summary judgment

(Docket No. 78).   The Court will also SCHEDULE a hearing on April 19, 2007 at 10

a.m. in Courtroom 7A to (i) discuss whether WMJ wishes to pursue the laches issue, and,

if so, to set a discovery and briefing schedule, and (ii) schedule a trial on the surviving

claims.  A status report is due one week before the hearing.


Dated this 30th day of March, 2007.


                                                           /s/_____
                                                           Benson Everett Legg
                                                           Chief Judge